The **BULLARD COMPANY**, Plaintiff,

v.

**GENERAL ELECTRIC COMPANY,**
**Defendant.**

**Civ. A. No. 68.**

United States District Court
W. D. Virginia,
Charlottesville Division.

Sept. 18, 1964.

George E. Faithful, Davis, Hoxie, Faithfull & Hapgood, New York City, Paul M. Geist, Bridgeport, Conn., Robert E. Taylor, Taylor, Camblos & Michie, Charlottesville, Va., for plaintiff, The Bullard Company.

Laurence B. Dodds, Little Neck, N. Y., Leonard G. Muse, Woods, Rogers, Muse & Walker, Roanoke, Va., L. B. Birdzell, Jr., and Melvin M. Goldenberg, New York City, for defendant, General Electric Company.

DALTON, Chief Judge.

The strength of these United States is closely aligned to the fact that we are a nation of mechanical "know-how". This is the principal reason that our country is the most powerful in the world and is the only nation that is free and has the power to remain free.

Automation is the keystone of our national defense strength and is the key factor in our having more gadgets and more conveniences for a higher standard of living than all the rest of earth's nations combined. Machine tools geared to automation, which are the implements of mass production, keep our country ahead in the progress of civilization.

It is a controversy relative to the art of automatic controls to machine tools over which this litigation has arisen. The Bullard Company in 1960 complained in this Court that General Electric Company had infringed two patents of Bullard, namely, Patent No. 2,352,183 issued June 27, 1944 (hereinafter referred to as Patent '183), and Patent No. 2,-575,792 issued under date of November 20,1951 (hereinafter referred to as Patent '792). The plaintiff asks for an injunction against defendant and an award of damages, costs and attorneys' fees.

General Electric's defenses are:

(1) Invalidity of plaintiff's patents because of prior patents, lack of any patentable invention, and because the subject matter of the patents was in public use and on sale in this country more than one year before Bullard's applications for patents, and that Patent '792 is inoperative;

(2) the defense of "File Wrapper Estoppel";

(3) that Bullard is barred by laches and equitable estoppel; and

(4) that even if the Bullard patents are valid, General Electric has not infringed those patents.

During the argument on objections to the report of the Special Master, General Electric's counsel, without waiving any

of its defenses, narrowed the discussion to: (1) Non-infringement, i. e., General Electric's devices are different in principle, and (2) laches and equitable estoppel.

Further, General Electric seeks a declaratory judgment holding Bullard's patents invalid and non-infringed by General Electric.

The Bullard patents relate to devices for the regulation of machine tool operation. The function of the machine tool mechanism is to carry out the directions or commands given it either by hand or by electronic control devices.

Whether the functioning of the machine be controlled by hand or by electronic means, the results are substantially the same. There is an honest difference of opinion between manufacturers as to the most effective and efficient method of operation.

The Special Master, James H. Michael, Jr., Esq., to whom this lengthy patent case was referred, has been very helpful to the Court in sifting and correlating the evidence and law applicable to the issues in this case. However, the Court is conscious of its ultimate judicial responsibility to decide the issues presented, and with that thought in mind, the Court sat with the Master throughout the proceedings in this case. Neither the Master nor the Court indicated to the other his thinking on the issues as the trial progressed. Further, the Court had the benefit of a demonstration hearing on December 13, 1963, after the Master's report.

The Special Master has found (M.R. 59) that the function of the date feedback arrangements in all these devices is the same, namely, to provide a system by which the movement of the work piece from point to point feeds information back to the control mechanism, which information is used to control the further activities of the machine. It is on this basis he has found equivalency, placing considerable reliance on the language of Mr. Justice Jackson in the case of Graver Tank & Mfg. Co. v. Linde Air Products, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950) (M.R. 66). Our thinking is that Mr. Justice Jackson, after observing that "The essence of the doctrine [of equivalents] is that one may not practice a fraud on a patent", was using the word "function" in the sense of action or "doing" and not in the sense of its end objective. For instance, the modern jet airplane motor has substantially superceded the piston motor for airplanes, because each "functions" in a different manner (a greater speed being obtained by the jet motor), but each has the same end objective of propelling the aircraft through the air. It could not rightfully be said that the jet motor is the equivalent of the piston motor, and yet we would have to so conclude if we applied the end result idea of the use of the term "function" in discussing equivalency.

While the Court agrees with much of the Special Master's report, the Court is in disagreement on the basic issue in this case, namely, the issue arising out of the Doctrine of Equivalents.

It is tacitly admitted on all sides that the accused device does not infringe the literal terms of the claims of Patent '183 and Patent '792. Is there any basis for a finding of infringement under the Doctrine of Equivalents? Let us first look at the statutes. In accordance with the power granted by the United States Constitution, the 82nd Congress enacted Public Law 593, generally referred to as the Patents Act of 1952. Section 154 of Title 35 of the United States Code provides that:

"Every patent shall contain a short title of the invention and *a grant to the patentee,* his heirs or assigns, for the term of seventeen years, *of the right to exclude others from making, using or selling the invention* throughout the United States, *referring to the specifications for the particulars thereof.* A copy of the specification and drawings shall be annexed to the patent and be a part thereof." (Emphasis added)

With respect to the specifications, section 112 of Title 35 of the United States Code provides:

"*The specification shall contain a written description of the invention,* and of the manner and process of making and using it, *in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same,* and shall set forth the best mode contemplated by the inventor of carrying out his invention.

"*The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.*

"An element in a claim for a combination may be expressed as a means or a step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." (Emphasis added)

Thus, the Patents Act of 1952 gives to the patentee only the right "to exclude others from making, using, or selling the invention" set forth in the specifications, which specifications must be in "full, clear, concise, and exact terms" and must conclude with one or more claims "particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." Section 271(a) of Title 35 of the United States Code provides that "whether without authority makes, uses or sells any *patented invention* * * * infringes the patent." This review of the current applicable statutes would seem to indicate that Congress intended to limit infringement to a transgression of the literal terms of the patent claims. It may well be that the Congress, in enacting the Patents Act of 1952, intended to limit every action for infringement of patents to the invention specifically covered by the claims of the specifications and to thereby eliminate the Doctrine of Equivalents. The legislative history of the Act throws no light on this point. It is not necessary to so decide in this case.

■ In the last analysis, the invoking of the Doctrine of Equivalents is an application of equity principles. It permits the expansion of the scope of the written claims if equity demands it, to prevent a fraud on the patentee (Graver Tank & Mfg. Co. v. Linde Air Products, supra), by too narrow construction of the invention, or to prevent a fraud on an alleged infringer by too broad a construction (Westinghouse v. Boyden Power-Brake Co., 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136 (1897)). In the Graver case, the Supreme Court applied the Doctrine of Equivalents, to do equity to the patentee who had taught the art how to make the infringing composition, by disclosure in his specifications, even though the disclosure was not embraced in the claims held valid in the final adjudication by the Court.

In spite of its equitable nature, this court is constrained to go slowing in applying the Doctrine of Equivalents. The application of the doctrine is logically inconsistent with the function of the claim as the measure of the grant to the patentee. It is opposed to the policy of informing the public of the exact limits of the granted monopoly. It runs counter to the tendency to limit patent monopolies as being an exception to our competitive enterprise system.

None of the criteria used by the courts in applying the Doctrine of Equivalents prevail in this case. The plaintiff's inventor(s) in this case are not the "garret" type of inventor. They are representatives of a well organized and well financed corporation. They were represented by competent and skillful patent attorneys through all of the numerous conferences with the examiners in the Patent Office. Much care was exercised

in the drafting of the claims of the patents claimed to be infringed to avoid a conflict with the prior art. Certainly Patent '183 and Patent '792 are not pioneer patents, disclosing a brand-new machine, but they lie in the midst of a crowded art, and only by construing their claims narrowly can they be cleared from the attack of invalidity due to the lack of a patentable invention. All must agree that there has been no "fraud" or "piracy" on the part of the defendant with respect to Patent '183 and Patent '792. Defendant has spent immeasurable hours of research and large sums of money in an effort to find a new machine that will function electronically.

Someone has said, "There is nothing new under the sun." Again, there is an old axiom of "Things equal to the same thing are equal to each other." The Doctrine of Equivalents means just what the word "equivalent" says—equal in force or authority; alike in significance; virtually or in effect identical. But it is not in the definition of the doctrine that one is perplexed—it is in the application of the doctrine to a particular case that difficulty arises.

To come within the ambit of the Doctrine of Equivalents, the law is simple and concisely stated by Judge Parker in Demco, Inc. v. Doughnut Machine Corp., 62 F.2d 23, 25 (C.A. 4, 1932):

"Plaintiff is entitled to protection against machines which substantially copy the machines which they invented, by doing the same thing in substantially the same way, but not against machines that proceed on a different principle, even though they accomplish the same result. It is elementary that the mere function of a machine is not patentable, and that the claims of a patent must be construed in the light of the specifications and drawings to which they relate, and not given an interpretation so broad as to cover the function of the machine patented and thus protect against every possible machine with like function."

The question involved in the Bullard-General Electric dispute is whether there exists such a departure in the principle and methods in the General Electric machine from those of the Bullard machine which would remove this case from the category of equivalents.

To the Court, it seems that Bullard's accomplishments have been in the field of manually controlled machine tools, whereas, General Electric's (and probably other builders and users) real contributions to the machine tool industry has been in the field of adapting machine tools to electronic controls. The methods of operation of the General Electric electronic controls seem to the Court to be a vast departure from the Bullard Man-Au-Trol (as the name implies control by hand) machine.

The Court's determination in this particular instance is supported by the actions of the Patent Office. The Kelling patents which cover the accused General Electric device were issued on September 25, 1956, August 19, 1958, January 20, 1959, and September 22, 1959, all after the issuance of Patent '183 and Patent '792 and after the enactment of the Patent Act of 1952. Section 103 of Title 35 of the United States Code provides in pertinent part as follows:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. * * *"

By the issuance of the referenced Kelling patents, the trained examiner of the Patent Office could not have considered the inventions of the Kelling patents as the equivalent of the invention of Patent '183 and Patent '792.

Equivalence is largely a question of fact, and the Court is conscious that it

is controlled by provisions of Rule 53(e)(II) which provides that the Court shall accept the Master's findings of fact unless clearly erroneous. London v. Troitino Bros., Inc., 301 F.2d 116 (1963). However, the facts set forth in the record on this problem of equivalence are just as open to the District Court or the Court of Appeals as to the Master, and this Court's view is that the methods and principle of the General Electric Mark II device involve so great a departure and change from Bullard's Man-Au-Trol apparatus that there is no equivalence in fact.

Admittedly, the idea of machine tool controls by hand were the inventive idea of Bullard, but General Electric came along with its extraordinary skill in the field of electronics and put its touch of adroitness and ability to the machine tool, changing from manual control to electronic control—thereby revolutionizing the machine tool industry. Many other nationally-known manufacturers are now using electronic controls.

The General Electric machine is a concept of automation in which machines, by a punched paper tape, written on a typewriter by a human operator and fed into the machine, are commanded to perform intricate metal-working operations to exacting tolerances. Once the punched tape is cut, it can be filed away and, if necessary (as is frequently the case), can be used over again. The use of the punched paper tape eliminates the necessity for a highly skilled mechanic to set the "stops" and "dogs" that tell the machine where to go and what to do. It requires only a quick look by the layman to recognize the reason why "numerical control" or machines directed by electronic controls are fast taking over the greater percentage of the Machine tool business. The differences between the Bullard Man-Au-Trol and the General Electric Mark II—NPC—are too broad to be considered a narrow improvement invention.

For General Electric and other manufacturers using electronic controls to be forced to pay royalties to the inventor of the hand control devices would not be justified under the facts and circumstances of this case. We are living in a technological age in which there are constant changes and improvements over the old way of doing things. To substantially copy a machine or device of another is an infringement. However, when we are faced with the changing from the laborious hand methods to the field of electronic power and control, then this is a departure that removes this case from the application of the Doctrine of Equivalents. Were this not true, the wheels of progress would be locked.

 Having found that there is no infringement of plaintiff's Patent '183 and Patent '792, it is not necessary for the Court to pass on the other matters raised by the pleadings.

Counsel are requested to submit an order in conformity with this opinion.

Each party shall bear its own costs.