MILLIKEN RESEARCH
CORP., Plaintiff,

v.

DAN RIVER, INC., Defendant.

Civ. A. No. 70–C–13–D.

United States District Court,
W.D. Virginia,
Danville Division.

Dec. 29, 1982.

Roger W. Parkhurst, Parkhurst & Oliff, Alexandria, Va., James H. Michael, Jr., Charlottesville, Va., for plaintiff.

Roger L. Tuttle, Dan-River Mills, Danville, Va., David Rabin, Greensboro, N.C., for defendant.

## MEMORANDUM OPINION

TURK, Chief Judge.

Plaintiff instituted this action on February 17, 1970 when it filed a complaint alleging that defendant had infringed two patents of which plaintiff was assignee. Defendant denied infringement and countered that the patents were invalid. Edward S. Graves, Esq., was appointed Special Master pursuant to Fed.R.Civ.P. 53, on June 17, 1970. Defendant's Motion for Summary Judgment was overruled by the Master and United States District Judge Ted Dalton on February 25, 1972. Thereafter, three hearings were held before the Special Master, and he filed Reports after each one, all three times finding that the patents were valid and that defendant had infringed them. Defendant has filed Objections to each of the Master's Reports, and those are now before this court for ruling.

After reviewing the many volumes of testimony,[1] the exhibits, and the briefs of the parties, the court concludes that, while most of the factual findings and statements of law made by the Special Master are sound, some of the conclusions drawn in applying the facts to the law are erroneous and must be rejected. Specifically, the court concludes that the patents in suit are invalid for "obviousness" under 35 U.S.C. § 103.

Plaintiff has brought to the court's attention the very germane remarks of Judge Learned Hand in *Kohn v. Eimer*, 265 F. 900 (2d Cir.1920), concerning the expert's role in cases such as these. "When the judge has understood the specifications, he cannot avoid the responsibility of deciding himself all questions of infringement and anticipation, and the testimony of experts upon these issues is inevitably a burdensome impertinence."[2] The plaintiff empha-

---

1. The first hearing, which lasted some thirty days, is transcribed in volumes I through XXVII. The transcript of the second hearing, which took one day, and those of the third hearing, which took two days, have been numbered by this court, for convenience, as volumes XXVIII through XXX.

2. Of course, this contention must now be considered in the light of Fed.R.Evid. 704 which provides: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

In this regard, more of Judge Hand's poignant remarks deserve quotation. At one time, apparently, no judges presided at patent trials, and "there was no one to decide whether or not expert testimony was necessary." *Kohn v. Eimer*, 265 F. at 902. Certain "equity rules" were

sizes that the Special Master heard the evidence and read the briefs, and so his opinions are somehow inviolable. But this court would be remiss in its duties were it to blindly accept all of the Master's conclusions without critically examining them. *Beckley National Bank v. Boone*, 115 F.2d 513, 515–16 (4th Cir.), *cert. denied*, 313 U.S. 558, 61 S.Ct. 835, 85 L.Ed. 1519 (1940); *Carter Oil Co. v. McQuigg*, 112 F.2d 275, 279 (7th Cir.1940); *Bullard v. General Electric Co.*, 234 F.Supp. 995 (W.D.Va. 1964), *aff'd*, 348 F.2d 985 (4th Cir.1965).

On the other hand, the court agrees that defendant's "shotgun" approach to its attack on the Master's reports is not particularly helpful insofar as it is embodied in defendant's objections and proposed findings after each of the three reports. *Cf. Electronic Memories & Magnetics Corp. v. Control Data Corp.*, 188 U.S.P.Q. 449, 450 (N.D.Ill.1975) (reaching same conclusion). But the parties' briefs have been very helpful in crystallizing and organizing the issues so that this court can address them in a comprehensible manner.

The court agrees, with defendant, that the Special Master made very few findings to which the "clearly erroneous" standard of review applies. In reading the record it becomes clear that the issues involved are relatively few, when the record's bulk is considered, and not particularly complex. The number of true factual disputes is remarkably low. Most of the testimony relates to the numerous experts' opinions as to the proper interpretation of facts relatively undisputed. *See* note 2, *supra.* Further, "[a]lthough the underlying factual decisions ... are entitled to great weight, the ultimate question of obviousness under § 103 is one of law." *Kabushiki Kaisha Audio-Technica v. Atlantis Sound, Inc.,* 629 F.2d 978, 980 (4th Cir.1980).

## I. THE PATENTS IN SUIT

The patents, acquired by Bascum G. Lesley and assigned to plaintiff, relate to a method for producing warp knit fabrics and the fabrics thereby produced. Patent No. 3,277,673 [3] (sometimes referred to herein as "Lesley–2"), which issued on October 11, 1966, relates to the method and claims the following:

1. The method of forming a raised pile surface fabric with a knitting machine having two guide bars and a needle bar, comprising forming two loops from two yarns on each of a plurality of needles on said needle bar, one of said two yarns on each said needle being capable of substantial elastic elongation, stretching one loop formed of said one elastic yarn during loop formation on each of a plurality of needles while affecting sub-

---

formulated, however, which were designed "to render suits in equity less oppressive to suitors by some control over the admission of evidence." *Id.* In the case at bar, as in that era prior to the formation of the "equity rules," the Master was not authorized to pass on the objections as to admissibility but rather was limited to noting them for the record. And, as Judge Hand said, "[o]ne of the chiefest scandals of the old procedure was the interminable examination of experts, to extract their opinions upon the very issues which the courts alone could decide." *Id.* Before the Special Master, witnesses testifying for two or three hours would be cross-examined for three or four days or more. The record, spanning thirty volumes of transcript, demonstrates graphically the potential for disaster that would be inherent in a judicial system lacking rules of evidence. Defendant's counsel, in his zeal to fully develop the record, was the principal offender in this regard. His cross examinations of Dr. Brown illustrate the reason for the rule that the scope of the cross examination not go beyond that of the direct. Fed.R.Evid. 611(b). *Judge Hand* continued, "[t]he logomacy * which resulted from the cross-examination of an expert by the opposing lawyer was arid beyond belief. No one read it, everyone was annoyed by it, and some one paid for it." *Id.* With the exception that this court did "read it," these words apply perfectly to, and could have been written about, this case.

On a more positive note, it must be said that counsel and the witnesses for both parties demonstrated a very high degree of technical knowledge concerning the subject matter, as well as much stamina.

\* "Strife or contention in words only, or an argument about words." *Webster's New World Dictionary of the American Language* 832, def. 1 (2d College ed. 1972 & 1970).

3. *See* Defendant's Exhibit D–17. Defendant's exhibits will hereinafter be cited as "D –____" and Plaintiff's exhibits as "P—____."

stantially less stretch on the other said loop during loop formation, and permitting retraction of said substantially stretched loop after casting off thereof to thereby form a raised pile surface of said other loops, with the stretched and retracted yarn loops binding said other loops in place, and permitting the stretching during formation of each succeeding stretched loop to pull the preceding retracted said one loop tighter to thereby force the preceding adjacent said other loop further away from the foundation plane of the fabric as formed by said retracted loop.

2. The method according to claim 1 including maintaining the input tension of said one elastic yarn forming said one loop substantially above that of the yarn forming other said loop and substantially above the tension required for a balanced fabric construction.

3. The method according to claim 1 including permitting the feed of the other said yarn to form a loop thereof of a first size upon the completion of the loop-pulling portion of the needle stroke, while permitting the feed of said one elastic yarn to form a stretched loop thereof of size substantially equal to said first loop size but of substantially smaller effective loop size than said first loop size upon permissive retraction thereof after casting off.

4. The method of forming a knitted fabric having a raised nap surface, comprising successively pulling two yarns into loops on each of a plurality of needles and casting off said loops to form a knitted fabric, one of said yarns being elastically stretchable and being substantially stretched during loop formation while the other of said yarns is at a comparatively light tension and comparatively unstretched during loop formation, whereby the effective retracted length of such said one loop, after casting off, is substantially smaller than the effective length of each said other loop, to thereby yield an elastic foundation knit fabric having a raised nap surface formed of said other loops.

Patent No. 3,254,510[4] (sometimes referred to as "Lesley-3"), which issued on June 7, 1966, relates to the fabric and claims the following:

1. A warp knit fabric having a face side formed from stitches of a first yarn and a back side formed from stitches from a second yarn, said face side stitches being knit such that they contain a length of yarn at least 40% in excess of that required for a balanced fabric construction, said second yarn being capable of substantial elastic elongation [sic] and being uniformly closely knit and uniformly raising said face side stitches to form said face side stitches of loosely knit yarn to provide a uniform pile effect on one face of said fabric.

2. The structure of claim 1 wherein said first yarn is capable of elastic elongation.

Application No. 804,418 (sometimes referred to as "Lesley-1"), the parent application to Lesley-2 and 3, was filed on April 6, 1959, and abandoned in 1965.[5]

Defendant has expended much effort in attempting to prove what it contends is the meaning of the patents. It will be helpful to note at the outset what the court believes is disclosed by the Lesley patents.

Much of defendant's argument is premised on the view that certain terms are unambiguous and, to the extent that is so, the claims should be read in isolation, viz., without reference to the specifications. Relevant in this respect is *United States v. Adams*, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966): "While the claims of a patent limit the invention, and specifications cannot be utilized to expand the patent monopoly ..., it is fundamental that the claims are to be construed in the light of the specifications and both are to be read with a view to ascertaining the invention...." 383 U.S. at 48–49, 86 S.Ct. at 713. *See also City of Grafton, W.Va. v.*

4. *See* D-27.

5. *See* D-1 (file wrapper of Lesley-1).

*Otis Elevator Co.*, 166 F.2d 816, 819 (4th Cir.1948). Further, the parties do not contest the general notion that a patentee may be his own lexicographer. *Long Mfg. Co. v. Holliday*, 246 F.2d 95, 99 (4th Cir.1957), *cert. denied*, 355 U.S. 926, 78 S.Ct. 384, 2 L.Ed.2d 357 (1958). The court, in formulating this opinion, has attempted to construe the patents at issue in a realistic and logical manner, and has sought to avoid any of the "patent nonsense" spoken of in *Ex Parte Tiemann*, 157 U.S.P.Q. 158, 159 (Pat.Off.Bd.App.1967). Unfortunately, the record is filled with witnesses testifying, and attorneys insinuating, that certain words mean quite the opposite of what they say. The court can only hope that it has not been unduly influenced by these endeavors.

Without reviewing all of the defendant's detailed contentions, it should be noted that defendant maintains that the patents call for a warp or weft [6] knit fabric with a loop side pile, that is, a pile on the technical face.[7] Another contention critical to defendant's case is that, when Lesley calls for a "balanced" construction, that term is well-understood in the art to refer to a fabric with straight wale lines, *i.e.*, ones that are not zig-zagged. Thus, there is no need to refer to Lesley's definition of "balanced fabric" as one "in which the amount of yarn fed to and lying in the fabric is the amount required to equally accommodate all of the movements of the yarn guides and needles during fabric formation."

With these contentions in mind, the court concludes the following:

First, the claims are ambiguous *in toto*, and must be read in conjunction with the specifications in order to determine what Lesley was claiming.

Second, it is fairly apparent that Lesley was claiming a lap side, or technical back, pile. The inventor maintained this stodgily throughout his testimony. To be sure, the specifications contain a number of indications to the contrary. Most impressive are references in the specifications to the "loops 33" or "stitches 33" in the drawings accompanying the patents which are defined as forming the pile: "the raised pile or nap surface is formed by the stitches 33 of the yarn Y on the bottom side of the fabric, with the more highly tensioned elastic yarn X being more predominant in the foundation and on the upper side of the fabric." Lesley-2, col. 2, lines 22–26.[8] Further, figures 1, 2, and 3, which purport to show the pile effect, do suggest that the pile is formed on the technical face by the needle loops. Plaintiff maintains that these drawings are only partial ones, and that the lap portion of the fabrics has been omitted. This may be so, but if it is, it is extraordinary that Lesley would claim a lap side pile and not illustrate the same in these figures (especially since figures 5 and

---

**6.** The attempt to characterize at least Lesley–2 as disclosing weft as well as warp knitting is apparently designed to make Lawson patent no. 2,009,361 relevant as prior art. Lawson is cited by defendant as disclosing the use of a rubber yarn, which, in the words of Lesley's patents, is "capable of substantial elastic elongation." The court need not rely on Lawson as prior art, since Cooper, which is relevant prior art, is effective toward that end. The court would hesitate to use a patent directed toward weft knitting against one directed toward warp knitting, *Jones Knitting Corp. v. Morgan*, 361 F.2d 451 (3d Cir.1966), although it is not the method of knitting, but rather one of the ingredients (*i.e.*, the rubber yarn) for which defendant relies upon Lawson.

**7.** Plaintiff has made much of the contention that defendant's position as to exactly what was called for by Lesley has vacillated. *See* discussion in Special Master's Report after first hearing, conclusion of law 5(a)(3). Without condoning what does appear to be some disingenuousness on defendant's part, the court notes that, as will be discussed more fully below, the Lesley patents contain internal inconsistencies that support equally the contention that Lesley calls for a loop or lap side pile.

**8.** Lesley–3, claim 1, similarly provides for a fabric having a "face side formed from stitches of a first yarn and a back side formed from stitches from a second yarn...." Dr. Brown testified that "back side" does not mean, in fact, back side, but the inside or foundation, of the fabric. XXIV: 115. This testimony is, to this court, confusing and unconvincing.

6, which do show the entire fabric, do not illustrate significantly protruding laps).

Finally, defendant makes much of Lesley's use of the term "joining loops" and concludes, from a review of the file history of Lesley-1, that this term refers to needle loops.

All of defendant's arguments have considerable merit. But they cannot be evaluated without also considering the numerous indications that a lap side pile was intended. The specifications state, for example, that "[i]t is the laps of the stitches formed from the loosely tensioned warp that protrude from the small tight knit foundation of the fabric to produce a raised nap or pile effect." Lesley-2, col. 1, lines 68–71. And, "FIGURE 6 is a drawing of the face of the fabric of FIGURE 5 illustrating the raised lap portions of the stitches formed from the loosely knit warp which results in a pile effect." Lesley-2, col. 2, lines 32–35.

Lesley also indicated that his invention can be practiced with the tighter tensioned yarn on either the front or back warp, but that the latter embodiment is preferred because, otherwise, the tighter yarn would interfere with the other. Lesley-2, col. 4, lines 56–74. In this regard, it would appear that utilization of the tighter yarn on the back bar results in a lap side pile; whereas knitting with the tighter yarn on the front bar results in a loop side pile. Defendant's exhibit 197, knitted in accordance with this latter suggestion, bears out this conclusion. Dr. Brown took the position, however, that both of the embodiments disclosed by Lesley were designed to result in a lap side pile. *See* Brown, XXII: 109–112: according to Dr. Brown, the specifications referred to mean "that it is possible to knit fabrics with a lap side pile with the tighter tensioned warp fed either to the

back or to the front bar of a multi-bar tricot knitting machine." Brown, XXII: 110. The evidence, however, suggests that, at least when the warps lap in opposite directions, fabrics knitted with a tightly-tensioned front bar yarn have a loop side pile. This is because the front bar laps prevent the back bar laps from poking through to the technical back, and the excess yarn from the back bar tends to appear on the technical face.

Finally, the examples contained in Lesley-2 and 3 would clearly result in a lap side pile.

The court concludes that, when the patents are read as a whole, they disclose a warp knit fabric in which a lap side pile is formed as a result of knitting two warps in which the yarn fed from one warp through the back guide bars is more heavily tensioned or highly stretched than the other yarn.[9]

Another important point of contention, which is vital to several of defendant's arguments, concerns the scope of the term "balanced fabric." According to Dr. Brown, the formula called for by Lesley is a purely mathematical one which depends only upon the stitch pattern for its application. Thus, the familiar "Jersey stitch" requires a runner ratio of 3:2 in order to be "balanced." Defendant, on the other hand, maintains that such a formula is unworkable, and that the true test is a practical one: a fabric is "balanced" is the wale lines are straight, and "unbalanced" if they are zig-zagged. Dr. Brown counters that the forces acting upon the wales in a fabric are so complex that one cannot tell, merely by looking at a fabric, whether or not it is "balanced." Significantly, Lesley himself testified that a fabric was "balanced" if the wales are aligned in a straight line, "if that

---

9. In this court's opinion, the inconsistencies, inaccuracies, and general confusion present in the Lesley patents are sufficient to raise serious problems of indefiniteness under 35 U.S.C. § 112. It appears that Lesley and his patent attorney had something of a communication breakdown. Bearing in mind, however, that "when the Patent Office has granted a patent to the successful inventor, the courts should not be ready to adopt a narrow or astute construction, fatal to the grant ...," *Keystone Manufacturing Co. v. Adams,* 151 U.S. 139, 145, 14 S.Ct. 295, 297, 38 L.Ed. 103 (1894), the court need not go so far. The better course seems to be to concede the construction called for by the plaintiff, and to consider the question of obviousness from that point of view.

line isn't changed when the load is applied to the fabric...." Lesley, XXI: 105–06.

Based on all of the testimony developed regarding the balanced/unbalanced dichotomy, the court concludes that the definition contained in the patents, as interpreted by Dr. Brown, must prevail. As was noted earlier, the parties do not dispute that a patentee may be his own lexicographer. Further, "[a]n inventor has a right to define specific terms as used in a patent, and, while the drawings and specifications may not enlarge the scope of the claims, they may be considered in determining the inventor's definition of the terms he employed." *Long Manufacturing Co. v. Holliday*, 246 F.2d 95, 99 (4th Cir.1957), *cert. denied*, 355 U.S. 926, 78 S.Ct. 384, 2 L.Ed.2d 357 (1958).[10]

These preliminary remarks should place in context the remainder of the discussion. It also disposes *ab initio* of some of defendant's contentions (*e.g.*, that the accused fabrics, having straight wale lines, are "balanced" and hence without the Lesley claims, which call for "unbalance"). *See* note 31, *infra*. Other aspects of the patents will be discussed when they come up.

## II. PRIOR ART

Several prior art references are relevant to the discussion which follows as to "obviousness" under § 103. At this point, the court will discuss several of the references in issue to determine whether they are even properly considered against the Lesley patents. (The prior art is discussed further in part III(A), *infra*.)

### A. *"Lesley-on-sale fabrics"*

Defendant has advanced a number of arguments the validity of which depend upon the effect of the changes made between Lesley–1, and Lesley–2 and 3.[11] To accept defendant's arguments would result in the consideration of the "Lesley-on-sale"[12] fabrics as prior art against the patents in suit. Such "prior art," even though developed by the patentee, may nevertheless be considered under circumstances discussed below, as if it were developed by a third party. It appears, however, that the Special Master was correct in holding that the "Lesley-on-sale" fabrics were part of the history of the prosecution of the Lesley patents, and are not properly considered as prior art.

Basically, the dispute concerns the yarns that were disclosed. In Lesley–1, paragraph 17 of the application provided that: "[a]lmost any type of yarn can be employed in the manufacture of fabrics according to this invention, but continuous filament yarns generally give the most desirable results." Lesley–1 then suggested a number of examples, including nylon, type 66 and 6, Dacron polyester yarn, and Orlon acrylic yarn.

In his continuation application, however, Lesley modified his specifications as follows: in paragraph 6, he indicated that one of the warps should contain "yarns of relatively high elasticity (i.e., capable of from about 10–50% or more elastic elongation before breaking ...," and, in paragraph 17, he indicated that "the tighter tensioned warp must be formed of relatively elastic yarn (preferably capable of about 40% or 50% or more elastic elongation without breaking)...." These specifications found their way into Lesley 2 (col. 1, lines 50–52; col. 5, lines 2–4) and Lesley–3 (col. 1, lines

---

**10.** Parenthetically, it appears to this court that the term "balanced," as contemplated by Lesley, seems to have little relevance when spandex and nylon are knitted together. In that case, it appears that the spandex dominates the material, whereas the nylon comes to rest where it will. When two similar or identical yarns are knitted together under different tensions, on the other hand, it seems as if the one knitted under a lesser tension still has some influence upon the final disposition of the wale lines.

The court does not purport to take these statements as true, since this judge is certainly not a knitting expert. These comments do tend to support defendant's position, however, that a fabric knitted with spandex is of a different character from one knitted completely of nylon or yarns of comparable elasticity.

**11.** D–38 contains a complete description of these changes.

**12.** *See* D–74A; P–66.

53–55; col. 5, lines 6–8). Further, in the claims, Lesley added references to a "second yarn being capable of substantial elastic elongation ...," Lesley–3, claim 1, col. 6, lines 30–31, and a "first yarn ... capable of elastic elongation." Lesley–3, claim 2, col. 6, lines 35–36. (Similar descriptions are found in the Lesley–2 claims.)

Lesley–2 was originally filed as a "continuation sole" application. *See* Lesley–2 file wrapper, D–18, at p. 17. The patent examiner felt that the introduction of yarn having "relatively high elasticity" was new matter. *See id.*, at 32. Lesley acquiesced, and filed a continuation-in-part oath. *Id.* at 41.

The Board of Patent Appeals, in allowing Lesley–2, noted:

> As to the Examiner's contention in the paragraph bridging pages 6 and 7 of the Answer to the effect that the material employed, elastic yarn, is of no patentable significance on the basis that the claims do not recite method steps "for dealing with problems engendered by the use of elastic yarn," we find no merit therein since the claims do recite stretching and retracting of loops formed from the elastic yarn.

*Id.* at 64.

Defendant's arguments, briefly, are these: (1) Lesley–1 disclosed an invention containing only one species—nylon, polyester, acrylic, etc.—of the genus which includes all other yarns including spandex, rubber yarn, and the like; (2) the "Lesley-on-sale" fabrics constituted the reduction to practice of Lesley–1's species disclosure; (3) Lesley–2 and 3 expand Lesley–1 to disclose the genus of yarns referred to above; and (4) the Lesley-on-sale fabrics, representing the species claims, were on sale more than one year prior to the filing of, and therefore invalidate, the generic claims found in Lesley–2 and 3, under 35 U.S.C. § 102(b). Further, Lesley's failure to disclose Lesley-on-sale fabrics to the patent examiner during the prosecution of Lesley–2 and 3 constitutes unfair dealing and therefore invalidates the patent. Finally, the patents are invalid for "late claiming"

under the doctrine of *Muncie Gear Works, Inc. v. Outboard Marine & Mfg. Co.*, 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171 (1942), that is, Lesley has attempted to broaden Lesley–1 by adding "new matter" for which there is no support in Lesley–1.

Plaintiff's position on all of these issues is, basically, that there is no "new matter," and that Lesley–2 and 3 merely identified what was inherent in Lesley–1, *i.e.*, that the yarns disclosed in Lesley–1 are capable of "substantial elastic elongation." Further, plaintiff contends that the description of yarns having "substantial elastic elongation" as being those yarns "capable of 10–50%," or "40 or 50% or more" elastic elongation without breaking constituted error on his part. His continuation application, he urges, contemplated the same yarns as did Lesley–1; unfortunately, Mr. Lesley "did not precisely measure the elasticity of these yarns and therefore erroneously described the extent of their elasticity in his continuation-in-part." *Post Trial Brief On Behalf of Plaintiff Deering Milliken Research Corporation*, July 29, 1974, at p. 63. Thus, if the court reads plaintiff's argument correctly, Lesley contemplated the use of any yarn capable of elongation comparable to that of nylon, and spandex happens to fit within that category. Further, the type of yarn utilized is not critical to the patent; the method and product remain the same whether spandex or nylon are used on the back bar warp.

### 1. *Generic/Specific dichotomy*

Defendant relies primarily on the following cases: *Application of Lukach*, 442 F.2d 967 (CCPA 1971); *Application of Ruscetta*, 255 F.2d 687 (CCPA 1958); *In re Steenbock*, 83 F.2d 912 (CCPA 1936); and *Chemithon Corp. v. Procter & Gamble Co.*, 287 F.Supp. 291 (D.Md.1968), *aff'd*, 427 F.2d 893 (4th Cir.), *cert. denied*, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970), for the general proposition that an earlier, specific claim does not support a later, generic claim. It is significant, however, that all of these cases deal with chemicals and their

utilization for, as the court said in *Steenbock:*

> The principle is well established in *chemical cases, and in cases involving compositions of matter,* that the disclosure of a species in a cited reference is sufficient to prevent a later applicant from obtaining generic claims, although the disclosure in an application of a species may not be a sufficient basis for a generic claim.

83 F.2d at 913 (emphasis added).

■ The applicable statutes are 35 U.S.C. §§ 120 and 112. Section 120 provides that Lesley–2 and 3 should benefit from the filing date of Lesley–1 if Lesley–1 disclosed the subject matter in the later applications "in the manner provided by the first paragraph of Section 112...." Section 112, first paragraph, provides:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

In determining whether Lesley–2 and 3 find support in Lesley–1 within the contemplation of § 112, *Application of Bowen,* 492 F.2d 859 (CCPA 1974) is relevant. In *Bowen,* the applicant claimed a filtering process which included the introduction of a "polymerizable material" into a polymerization vessel. The specifications disclosed only one species of such polymerizable material—nylon 66—and the Patent Office Board of Appeals rejected the application on the ground that the specific disclosure in the specifications did not support the generic claim of all "polymerizable materials" to the satisfaction of the requirements of § 112, ¶ first.

The applicant argued, before the Court of Customs and Patent Appeals, that "the general rule on adequacy of disclosure is that disclosure of a single species is adequate support for a generic claim ...," 492 F.2d at 859, and that the rule advanced by the patent office was an exception, to be applied only in cases involving chemicals. *Id.*

The Court of Customs and Patent Appeals held, first, that resolution of the issue did not turn "on whether the case is denominated 'chemical' or 'mechanical.' " *Id.* at 862. The court indicated that it "would prefer to see the dichotomy which lawyers find in the chemical and mechanical cases 'denominated a dichotomy between predictable and unpredictable factors in any art.' " *Id., quoting from In re Cook,* 439 F.2d 730, 734 (CCPA 1971). The court then recognized that uncertainty was more likely to be present in "chemical cases," but this was not grounds for a *per se* rule. The court held finally that the Patent Office had supplied "no persuasive reason ... why the specification does not realistically enable one skilled in the art to practice the invention as broadly as it is claimed." 492 F.2d at 863.

Applying these principles to the case at bar, the court concludes that Lesley–1 supports the patents in suit insofar as they disclose yarn capable of "substantial elastic elongation." Although Lesley–1 discloses only yarn of minimal stretch capability, as compared with spandex or rubber yarn, it would be expected that one skilled in the art would substitute the more elastic yarns for the nylon and other yarns disclosed in Lesley–1.

This holding is entirely consistent with defendant's position as regards the prior art as a whole: defendant argues that Lesley–2 and 3 are obvious in light of not only the Lesley-on-sale fabrics but all of the prior art. Throughout the hearings before the Special Master, defendant repeatedly emphasized, through its witnesses, that a skilled knitter would tend to substitute one yarn for another in practicing the teaching of any or all of the prior patents, articles, and fabrics. Thus, it was reasonably foreseeable that a skilled knitter, in practicing Lesley–1, would, when the yarn became available, substitute spandex for the back bar yarn.

Accordingly, the court holds that the specific disclosures as to yarn types in Lesley–1 provide sufficient support, within the meaning of § 112, for the claims in Lesley–2 and 3. Accordingly, those patents are entitled to the filing date of Lesley–1 by the operation of § 120. This being so, the Lesley-on-sale fabrics were not "in public use or on sale in this country, more than one year prior to" the effective date of the patents in suit, 35 U.S.C. § 102(b), and are hence not available, under those provisions, as prior art against those patents.

### 2. "Late Claiming Under the Muncie Gear Doctrine

Defendant argues that the claims in the patents in suit are invalid for "late claiming" under the doctrine of *Muncie Gear Works, Inc. v. Outboard, Marine & Mfg. Co.*, 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171 (1942). In *Muncie*, the applicant for a patent involving outboard motors first filed an application in 1926 and amended it several times thereafter, the latest amendments being in December 1928 and March 1929. The patent as finally allowed resulted from the March 1929 amendments. The invention had been in public use in January or February 1927. This public use was within two years of the December 1928 filing date, but more than two years prior to the March, 1929 filing date. The predecessor to 35 U.S.C. § 102(b), R.S. § 4886, then allowed the issuance of a patent to one whose invention was "not in public use or on sale in this country for more than two years prior to his application." The court held that the March 1929 filing date was the proper one, and R.S. § 4886 therefore invalidated the patent. The inventor was not entitled to the December 1928 filing date because that application "wholly failed to disclose the invention now asserted." 315 U.S. at 768, 62 S.Ct. at 869. The 1929 application disclosed completely new matter which changed the emphasis of the patents.

*Muncie* "condemned" the attempt "to broaden a claim to include matter not described in the specification which had become public property through public sale." *Chicopee Mfg. Corp. v. Kendall Co.*, 288 F.2d 719, 724 (4th Cir.), *cert. denied*, 368 U.S. 825, 82 S.Ct. 44, 7 L.Ed.2d 29 (1961). The majority view reads *Muncie* as "an application of the statutory prohibition against the introduction by amendment, after the filing date, of additional disclosure in application and claims directed thereto." *Westphal v. Fawzi*, 666 F.2d 575, 577 & 577 n. 1 (CCPA 1981). Further,

[a]n amendment of a claim or a later filed claim does not change the "date of the application" as the reference date for applicability of the time bar in § 102(b). Further, the effective "date of the application," insofar as the disclosure in the specification is concerned, is the date on which the applicant has satisfied the requirements of § 112. Though introduction of new matter into the disclosure falls under the prohibitions of 35 U.S.C. § 132, later submitted claims need only be reviewed for support in the original disclosure under § 112, first paragraph.

*Id.* This suggests that the analysis under *Muncie Gear* is identical to that under the generic/specific analysis discussed immediately above. *See also Application of Ruscetta*, 255 F.2d 687, 691 (CCPA 1958). The key issue, then, is whether Lesley–2 and 3 find support in Lesley–1 within the meaning of § 112. As noted earlier, this court concludes that the test is met. *Application of Bowen*, 492 F.2d 859 (CCPA 1974).

Accordingly, the court concludes that the Lesley-on-sale fabrics are not properly considered as prior art against Lesley–2 and 3. Those patents are entitled in full to the filing date of Lesley–1, and the fabrics were thus not on sale more than one year prior to the effective date of the patents in suit. Hence, § 102(b) is not a bar to the patents' validity.[13]

13. By this finding, the court implicitly approves conclusion of law 7(h)(6) of the Special Master's first report, although this opinion treats the issue in somewhat more detail.

Although Lesley filed a continuation-in-part oath, this does not alter the conclusion. The oath was at the behest of the Examiner who, as

## B. *Burlington Fabrics*

During the second supplemental hearing defendant produced several fabrics and accompanying construction sheets, all of which were apparently produced between 1952 and 1958. *See* D–285 to D–291. Several witnesses testified that the fabrics were actually produced in North Carolina and then relayed to New York, where they were shown to customers.

These fabrics, if properly considered as prior art, would be very helpful to defendant's case. They all disclose an over-feed of the front bar yarn far in excess of the 40%-more-than-balanced disclosed by Lesley. In fact, the only apparent deviation in construction detail is that the Burlington fabrics have, according to plaintiff, a longer quality than Lesley calls for. This is especially significant, because the Lesley patents do not emphasize quality. The fabrics apparently differ in appearance from those made strictly in accordance with the Lesley examples, but this appears to be as much a function of the fact that crimped nylon was used on the back bar, as the fact that the quality was different. And, in this regard, it is significant that Lesley explicitly advocates the substitution of yarns such as crimped nylon to obtain novel effects. *See* Lesley–2, col. 5, lines 17–20.

However, in order to utilize these fabrics as prior art, they must qualify as having been "in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States...." 35 U.S.C. § 102(b). The Special Master found that, although the evidence was suggestive toward that conclusion, it was "as a whole ... insufficient to establish that the fabrics were on sale more than a year prior to April 6, 1959, when the Lesley application was filed." *Second Supplementary Report of Special Master,* conclusion of law 2.

This conclusion, although styled as one of law, is in the nature of a factual determination and should be overruled only if "clearly erroneous." Defendant urges that the "on sale" nature of these fabrics was established by documentation and uncontradicted oral testimony. This is not exactly true, however. While the existence of the fabric swatches and construction sheets does tend to document the existence of such fabrics, it does not document in the least that such fabrics were ever shown to customers. That alleged fact was established entirely by parol.

Defendant makes much of the fact that the testimony was uncontroverted, and chides plaintiff's lawyers for ineffective cross-examination of these witnesses. But it is difficult to imagine how plaintiff could have disproved the testimony on defendant's behalf; certainly, it would not have been possible to find a witness to conclusively prove that the fabrics were never shown to customers.

The words of the Supreme Court in *Washburn & Moen Mfg. Co. v. Beat'Em All Barbed Wire,* 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154 (1892), are especially apt:

We have now to deal with certain unpatented devices, claimed to be complete anticipations of this patent, the existence and use of which are proven only by oral testimony. In view of the unsatisfactory character of such testimony, arising from the forgetfulness of witnesses, their liability to mistakes, their proneness to recollect things as the party calling them would have them recollect them, aside from the temptation to actual perjury, courts have not only imposed upon defendants the burden of proving such devices, but have required that the proof shall be clear, satisfactory and beyond a reasonable doubt. Witnesses whose memories are prodded by the eagerness of interested parties to elicit testimony favorable to themselves are not usually

---

has been concluded, was incorrect in deeming the elastic yarn to be new matter.

The defendant's argument concerning failure to disclose the "Lesley-on-sale fabrics" as unfair dealing is impressive. However, the court does not believe that Lesley and his attorney acted in bad faith in that regard, as they obviously considered the fabrics to be an integral part of the ongoing prosecution of the Lesley patents.

to be depended upon for accurate information. The very fact, which courts as well as the public have not failed to recognize, that almost every important patent, from the cotton gin of Whitney to the one under consideration, has been attacked by the testimony of witnesses who imagined they had made similar discoveries long before the patentee had claimed to have invented his device, has tended to throw a certain amount of discredit upon all that class of evidence, and to demand that it be subjected to the closest scrutiny. Indeed, the frequency with which testimony is tortured, or fabricated outright, to build up the defence of a prior use of the thing patented, goes far to justify the popular impression that the inventor may be treated as the lawful prey of the infringer.

143 U.S. at 284–85, 12 S.Ct. at 447.

This court certainly does not suggest that defendant's witnesses were less than honest with their testimony, at least within the limits that twenty years' passage imposes upon memory. But the Special Master was present at the hearing, and in the best position to assess credibility and efficacy of recollection. Further, there is no direct evidence that any such fabrics were offered for sale; rather, the witnesses testified generally as to Burlington procedures at the time and concluded that the fabrics *must* have been shown. In light of all this, it cannot be concluded that the Special Master was clearly erroneous.

Accordingly, the Burlington fabrics, D–285 to D–291, shall not be considered as prior art against the Lesley patents.

### C. *Celanese Fabrics*

█ Defendant also produced, at the third hearing, two fabrics produced by Celanese Corporation of America prior to 1954. These are contained in cards numbered 7165 and 7182, contained in turn in binders containing similar cards, entered in evidence as D–298 and D–299. D–298 was furnished to a subsidiary of plaintiff and D–299 was furnished to Burlington.

Fabric number 7182 has a front bar overfeed of approximately 25 per cent more than that required for a balanced fabric (using Lesley's definition) while number 7165 has a front bar overfeed of seven per cent. There was some discrepancy in the testimony as to exactly what effect the overfeed had in either fabric.

At the outset, however, it must be determined whether these fabrics were ever "on sale," or "in public use." The Special Master concluded that, like that with respect to the Burlington fabrics, the evidence was insufficient to demonstrate this. But this conclusion is clearly erroneous. The evidence is undisputed that the fabrics were furnished, in D–298 and D–299, to third persons, and that no restrictions were put on their use. In *Egbert v. Lippmann,* 104 U.S. 333, 14 Otto 333, 26 L.Ed. 755 (1881), the Court stated:

[T]o constitute the public use of an invention it is not necessary that more than one of the patented articles should be publicly used. The use of a great number may tend to strengthen the proof, but one well-defined case of such use is just as effectual to annul the patent as many.

\* \* \* \* \* \*

[S]econdly ..., whether the use of an invention is public or private does not necessarily depend upon the number of persons to whom its use is known. If an inventor, having made his device, gives or sells it to another, to be used by the donee or vendee, without limitation or restriction, or injunction of secrecy, and it is so used, such use is public, even though the use and knowledge of the use may be confined to one person.

We say, thirdly, that some inventions are by their very character only capable of being used where they cannot be seen or observed by the public eye. An invention may consist of a lever or spring, hidden in the running gear of a watch, or of a rachet, shaft, or cog-wheel covered from view in the recesses of a machine for spinning or weaving. Nevertheless, if its inventor sells a machine of which

his invention forms a part, and allows it to be used without restriction of any kind, the use is a public one.

104 U.S. at 336, 14 Otto at 336. *Accord, Kock v. Quaker Oats Co.*, 681 F.2d 649, 655–56 (CCPA 1982). *See also Metallizing Engineering Co.*, 153 F.2d 516 (2d Cir.) (L.Hand, J.), *cert. denied*, 328 U.S. 840, 66 S.Ct. 1016, 90 L.Ed. 1615 (1946).

Plaintiff's arguments are these: first, that there is no evidence as to when the Celanese fabrics were received by Burlington and plaintiff's subsidiary; but the very purpose of the binders was to send samples to customers. There is no significant question about whether they were received by Celanese customers prior to 1959. Second, plaintiff argues that Celanese was in the business of selling yarns, not fabrics; but the fact that the samples were supplied without restriction on use negates this argument. *See Egbert v. Lippmann, supra.* Finally, plaintiff argues that they were "experimental," and, as the court said in *Egbert v. Lippmann*, "a use necessarily open to public view, if made in good faith solely to test the qualities of the invention, and for the purpose of experiment, is not a public use within the meaning of the statute." 104 U.S. at 336, 14 Otto at 336. But, "[i]f the invention is out of the inventor's hands, it is irrelevant what experiments the buyer does or does not do with the invention." *Kock v. Quaker Oats Co., supra*, 681 F.2d at 655. Thus, to have an "experimental purpose," tests made by one other than the inventor must be made "under his direction." *Id., citing City of Elizabeth v. American Nicholson Pavement Co.*, 97 U.S. 126, 134, 7 Otto 126, 134, 24 L.Ed. 1000 (1978). That was not the case here.

Based on the foregoing, the court concludes that the Celanese fabrics were "in public use" more than one year prior to the filing date of Lesley–1, and are therefore properly considered as prior art against Lesley–2 and 3.

### D. *Cooper et al. No. 3,069,885* [14]

Cooper filed his patent application on March 16, 1959 and the patent issued on December 25, 1962. Briefly, Cooper '885 discloses the production of a warp knit fabric consisting of a spandex foundation plated on either side by a relatively inelastic yarn such as nylon. The patent does not specify runner lengths and makes no mention of a "pile." According to plaintiff, and to the Special Master, the key to Cooper '885 lies in the choice of denier ratios. In fact, the patent provides that, in order to provide adequate plating, "the ratios of the original relaxed deniers of the elastic yarns to the inelastic yarns must be below about 4:1." Col. 3, lines 36–38.

The main preliminary issue concerning Cooper is whether it can be considered as "prior art" for purposes of 35 U.S.C. § 103.[15]

Plaintiff maintains that, had Cooper been cited against Lesley's applications, he would have "sworn back" of the Cooper application, which predated the filing of Lesley–1 by about a month-and-a-half, under Patent Office Rule 131. The basis for this contention is the existence of the "Lesley-on-sale" fabrics[16] which, according to plaintiff, represented a reduction to practice of all that was ultimately disclosed in Lesley–1, 2, and 3, by March, 1959.

---

**14.** *See* D–21. The file history of this patent is identified as D–22.

**15.** Defendant argues that Cooper '885 squarely anticipates the patents in suit and therefore renders them invalid by virtue of 35 U.S.C. § 102(e). Thus, defendant argues, an interference should have been provoked by the Patent Examiner or by Lesley in the prosecution of his patents. Plaintiff counters that Lesley could not have copied any of Cooper's claims and an interference would have been precluded under Patent Office Rule 205 as it existed in 1962.

This rather simplifies the parties' arguments with respect to the questions concerning § 102(e) and interference practice. It is unnecessary, however, to address these issues, in light of the court's determination that the Lesley patents are obvious in light of Cooper and other prior art under § 103. If the court is wrong in holding Lesley–2 and 3 obvious, then there is certainly no complete anticipation under § 102(e).

**16.** *See* part "A," *supra.*

To counter plaintiff's contention, defendant seeks to, in effect, swear back of the Lesley-on-sale fabric by proffering what defendant maintains was a reduction to practice of Cooper '885 by November 1958. This is embodied in a fabric, found in a notebook kept by Walter Cooper, documenting his research and experimentation.[17] On the top of page 41 of this notebook is found a greige fabric, which for convenience this court will refer to as the "Cooper p. 41 fabric." The swatch is constructed according to the following specifications: nylon, 100 denier yarn on the front bar, runner length 93 inches, 1–0, 2–3 stitch pattern; Fiber K, 280 denier on the back bar, runner length 57 inches, 2–3, 1–0 stitch pattern. The fabric's quality is 13 inches.

■ The courts have held uniformly that what is "prior art" for purposes of § 102(g) is also "prior art" for purposes of § 103. Moreover, the fact that an invention is kept secret between its final reduction to practice and the filing of an application disclosing the invention does not prevent use of the invention as prior art to show obviousness if the invention was not "abandoned, suppressed, or concealed" within the meaning of § 102(g). *See Application of Bass*, 474 F.2d 1276, 1283–87 (CCPA 1973); *Sutter Products Co. v. Pettibone Milliken Corp.*, 428 F.2d 639, 645–47 (7th Cir.1970). The plaintiff does not appear to contest this general proposition; rather, plaintiff maintains that Cooper '885 does not disclose the Cooper p. 41 fabric and, accordingly, the Cooper application was filed too late to be considered as prior art against Lesley, which was reduced to practice before Cooper was filed.

■ The court accepts the principle of law that, in order to constitute "prior art" against Lesley, the Cooper p. 41 fabric must be disclosed by Cooper '885.[18] Plain-

tiff's position is that "the previous *work* of Cooper upon which Defendant seeks to rely, *is not part of the disclosure* of the subsequent Cooper patent." *Plaintiff's Brief After Supplemental Trial*, March 1, 1977, at 35 (emphasis in original). Thus, plaintiff's position seems to be that Cooper can be used as prior art against Lesley by virtue of the earlier reduction to practice as embodied in the Cooper p. 41 fabric, but only insofar as the fabric is disclosed by Cooper '885. So, to use an example, although the Cooper p. 41 fabric may have a lap side pile within the meaning of Lesley's patents (and plaintiff denies this), that fact may not be used against Lesley because Cooper '885 does not disclose a lap side "pile." This seems to be a roundabout concession on plaintiff's part that Cooper '885 may be used as prior art against Lesley, but nothing not disclosed in Cooper may be used. There is no need to adopt this contention as a matter of law. The court will consider Cooper '885 as prior art against Lesley, not the Cooper p. 41 fabric. The fabric is relevant only insofar as it makes Cooper '885 relevant under § 103 by virtue of § 102(g), thereby rendering the effective date of Cooper earlier than that of Lesley.

Perhaps this discussion represents a long way of agreeing completely with plaintiff's position as to the relevancy of Cooper '885. Indeed plaintiff's primary contention is that Cooper '885, by itself or in conjunction with other prior art, is ineffective to render Lesley–2 and 3 obvious. The court, obviously, disagrees with that argument. The discussion above is intended only to make clear the basis and scope of the court's reliance on Cooper '885 to that end.

### E. *Other Prior Art*

Defendant has proffered other prior art which require no extended discussion.

17. The notebook is identified as D–33.

18. The court concludes that Cooper did not unreasonably conceal his invention between November 1958, when it was purportedly reduced to practice, and April 1959, when Cooper's application was filed. There was not the purposeful, predatory concealment here that there was in, say, *Grinnell Corp. v. Virginia Electric & Power*

*Co.*, 277 F.Supp. 507 (E.D.Va.1967), *aff'd*, 401 F.2d 451 (4th Cir.1968) ("Suozzo purposely suppressed and concealed his sketches and models. He intended to reveal them only when it was to his financial advantage to do so. He did not apply for patents until after he learned of the plaintiff's activities." 277 F.Supp. at 518).

These are properly considered by this court, but they are less relevant than, or adequately represented by, the Cooper patent and the Celanese fabrics.[19]

The Reisfield articles, considered at the first supplemental hearing, were published from August 19, 1957 to February 29, 1960. Part 4, the "Reisfield Article," was published on February 24, 1958, and is therefore properly considered as prior art over Lesley. Reisfield relates to warp knit fabrics and discloses the procuction of long floats on the lap side by substantially overfeeding one bar. An example given by Reisfield demonstrates a 12 per cent overfeed; but Reisfield does not confine himself to a maximum overfeed.

The Weigkricht Article calls for "plush-like loops" on the technical fact, accomplished by overfeeding the back bar and knitting the front bar under normal tension.[20] The article does not specify runner lengths; neither does it disclose stretching of either yarn.

Other prior art is clearly of less import than that already cited, and is summarized in the Special Master's first report.

### III. "OBVIOUSNESS" UNDER 35 U.S.C. § 103 [21]

■ The Special Master repeatedly held, and plaintiff urges, that the patents in suit were not "obvious" under 35 U.S.C. § 103, which provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

■ The standards which the courts have developed in construing § 103 are well known and require little elaboration. Three factual determinations are necessary: (1) the scope and content of the prior art; (2) differences between the prior art and the claims at issue; and (3) the level of ordinary skill in the pertinent art. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1965). These criteria should be strictly observed. *Id.* at 17, 86 S.Ct. at 693. Further:

Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to

---

**19.** The Lawson patent, relating to weft knitting, has already been considered. *See* note 6, *supra.*

**20.** Part of the record has been devoted to establishing the true meaning of the Weigkricht Article, which was published in both German and Austrian. Various parties have translated portions of the article, but the one that seems to be the most probable (and the parties appear to have adopted it as the true one) is that of Mr. Engelhard. *See* Tr. XVI: 65–75, D–253, and D–254. In any event, the court does·not consider this prior art to be very significant.

The Weigkricht Article was, due to an initial incorrect translation, apparently responsible for defendant's ostensible change in position as to whether Lesley's patents call for a lap or loop side pile. *See* note 7, *supra.* Whether the front or back warp yarn is more highly tensioned, however, it appears to this court that knitters constantly experiment, with different yarns, tensions, qualities, etc. Lesley has simply taken one from among an infinite variety of such experiments and claimed it as his own.

**21.** The court recognizes that patents are, once issued, entitled to a strong presumption of validity. *Black & Decker Mfg. Co. v. Sears, Roebuck & Co.*, 679 F.2d 1101 (4th Cir.1982). This presumption, however, is rebuttable, *Kabushiki Kaisha Audio-Technica v. Atlantis Sound, Inc.*, 629 F.2d 978, 981 (4th Cir.1980), especially where relevant prior art has not been cited to the Patent Examiner. *Heyl & Patterson, Inc. v. McDowell Co.*, 317 F.2d 719, 722 (4th Cir.1963); *accord, Christopher J. Foster v. Newport News S. & D. Dock*, 531 F.2d 1243, 1245 (4th Cir.1975). It is fairly apparent that the Cooper patent, clearly the most relevant prior art reference, was not considered by the Patent Office. Further, it is notable that the Patent Examiner repeatedly held the patents to be anticipated by the prior art, and the patents only issued after a decision by the Patent Office Board of Appeals. *See* D–18 at 63–65.

add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only united old elements with no change in their respective functions ... obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly.

*A. & P. Tea Co. v. Supermarket Corp.,* 340 U.S. 147, 152–53, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950). Because of these considerations, "[i]t is usually difficult to find true inventiveness in a combination patent." *Heyl & Patterson, Inc. v. McDowell Co.,* 317 F.2d 719, 722 (4th Cir.1963). *See also Deering Milliken Research Corp. v. Beaunit Corp.,* 538 F.2d 1022 (4th Cir.), *cert. denied,* 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976); *Blohm & Voss AG v. Prudential-Grace Lines, Inc.,* 489 F.2d 231, 236–38 (4th Cir.1973), *cert. denied,* 419 U.S. 840, 95 S.Ct. 70, 42 L.Ed.2d 67 (1974). *Cf. Black & Decker Mfg. Co. v. Sears, Roebuck & Co.,* 679 F.2d 1101 (4th Cir. 1982) (patent on "Workmate" workbench not void for obviousness); *Tights, Inc. v. Acme-McCrary Corp.,* 541 F.2d 1047, 1057–60 (4th Cir.) (holding combination patent unobvious; record supported jury verdict), *cert. denied,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976).

Plaintiff urges that each claim of the patents must be considered against the background of the prior art. 35 U.S.C.

§ 282.[22] It is clear from reading the claims, the specifications, and the record as a whole that, whereas Lesley's supposed inventions relate primarily to the stretching of the back bar yarn considerably more than from the bar yarn (*see* Lesley–3, claim 1), the remaining disclosures in the claims either simply describe warp knitting, or describe effects which flow from the stretching differential. Thus, it is not really possible to consider each claim in isolation from the rest; in fact, it is not really clear to this court how each claim in the '673 patent differs from each other claim— they all seem to be variations of the same claim.[23] The claims must be considered in tandem.[24] *See* note 26, *infra.*

With these considerations in mind, the court turns to the three criteria described by the court in *Graham.*

#### A. Scope and Content of the Prior Art

##### 1. Cooper Patent

Cooper '885, as noted previously, discloses a warp-knit two-way stretch fabric consisting of an elastic yarn—spandex— plated between a technical back and front consisting of an inelastic yarn, such as cotton, nylon, or others similar. The patent, which resulted from Cooper's experimentation as documented in his notebook (D–33) represents an attempt—which has been very successful commercially—to utilize spandex yarns in a manner which conceals certain of their undesirable characteristics: they are clammy to the touch, and they tend to yellow with age. Plating accomplishes this design by insulating the spandex yarn from the wearer's touch, and by hiding the spandex behind yarns with

**22.** *See also Norfin, Inc. v. International Business Machines Corp.,* 625 F.2d 357, 363 (10th Cir. 1980); *Timely Products Corp. v. Arron,* 523 F.2d 288, 296 (2d Cir.1975).

**23.** With respect to Lesley–3, claim 2 states: "The structure of claim 1 wherein said first yarn is capable of elastic elongation." This clearly adds nothing to Claim 1, and is clearly obvious, since virtually *all* yarn is capable of "elastic elongation" under virtually any definition utilized by the parties throughout the proceedings.

**24.** Thus, for example, claim 1 discloses a differential in stretching. Claim 2 then claims a tension differential, but this seems to be a different way of saying the same thing. Claim 3 calls for a differential in effective loop size, but this is not a method, but a natural effect of the tension/stretching differential disclosed in claims 1 and 2. Claim 4 seems simply to restate the previous three claims. It would be impossible to hold some of the claims valid and others invalid, so dependent upon each other are they.

more desirable aesthetic qualities. The yarns are knitted in opposite directions. The patent's example discloses nylon on the front warp in a 1–0, 1–2 pattern, and spandex on the back bar in a 1–2, 1–0 pattern. No runner ratios or tension differentials[25] are specified, although the specification provides that "the amount of compression in the finished fabric may be readily controlled by those skilled in the art." Col. 3, lines 73–75. The patent also discloses that "[a] balanced lapping movement is used with the two sets of guide bars making similar movements in opposite directions." Col. 3, lines 10–13. Finally, the specification provides:

> In order to provide an acceptable fabric having a plated construction, i.e., with the yarns of the back guide bar being covered by the yarns of the front guide bar on both the face and back of the fabric, the ratios of the original relaxed deniers of the elastic yarns to the inelastic yarns must be below about 4:1. At ratios above this limit, incomplete covering of the bare elastic yarns results. Denier ratios between about 4:1 and 1:6 are preferred.

Col. 3, lines 33–40.

### 2. Celanese Fabrics

Only fabric swatch no. 7182 will be considered. This is a tricot warp knit fabric utilizing dull acetate yarn on the front warp and dacron on the back warp. The runner length on the front warp is 60 inches, and that on the back is 36 inches; this runner ratio is approximately 25 per cent in excess of that required for a balanced fabric (as defined by Lesley). Dr. Brown testified that the Celanese fabric differed from Lesley in that the overfeed was less than the 40 per cent called for by Lesley, the quality, at six inches, was too long, and the fabric does not show any kind of a pile. Brown, XXX: 246–47. He also testified, on cross-examination, that the

back bar yarn would be knitted under greater tension than the front bar yarn, XXX: 264–65, and that the excess yarn is situated in both the over and underlap portions of the stitches. XXX: 270. Finally, "any elevation of the laps away from the back [of the] fabric is ... minimal ...," and he "would certainly not describe it as protruding from that surface." XXX: 271. Defendant's witness testified that fabric 7182 had a "pile"—and not a "novelty fabric effect"—on the technical back. Beard, XXIX: 113–14. The Special Master concluded:

> Considering the testimony as a whole and the appearance of the fabrics as observed without magnification and the appearance of some under magnification the ... Celanese fabrics appear to be of a different structure and in a different category from the fabrics called for by Lesley Patent '510, and to have been produced by methods different, and in a different category, from those called for by the Lesley Patent '673, taking into consideration the elements of the claims of both patents read with (but not enlarged by) the specifications.

*Second Supplementary Report of Special Master,* finding of fact 20.

### 3. Other Prior Art

As mentioned previously, other prior art, although relevant, adds nothing to the art not found in Cooper and the Celanese fabric 7182. *See* pp. 17–18, *supra.*

## B. Differences Between Lesley Patents and Prior Art

The differences between the prior art and the patents in suit, based on the scope afforded the latter by this court, are fairly easily identified and the Special Master has painstakingly done so. This court disagrees mainly with the conclusion drawn from these differences.

---

**25.** It appears that the tension differential between the yarns in the accused fabrics is very slight, in absolute terms, whereas the Lesley patents call for a high tension differential. This is because spandex stretches a great deal at a relatively low (compared to nylon) tension. This makes it very uncertain whether the accused fabrics even infringe upon Lesley's claims. *See* note 31, *infra.*

As was true in *Blohm & Voss AG, supra*, it is also true "that there are some differences between [the Lesley patents] and each prior art reference, just as there are some differences between the prior art references themselves." 489 F.2d at 242–43. This necessarily follows from analysis under § 103; otherwise, the anticipation would be complete, and analysis would proceed under § 102. "[T]he mere existence of differences between the prior art and an invention does not establish the invention's nonobviousness." *Dann v. Johnson*, 425 U.S. 219, 230, 96 S.Ct. 1393, 1399, 47 L.Ed.2d 692 (1976).

The patents in suit compare to the prior art, basically, as follows: as in the Lesley patents, several of the prior art references call for an overfeed of the front bar yarn relative to the back bar yarn, especially the Reisfield article and the Celanese fabric 7182. On the other hand, Lesley calls for an overfeed of 40 per cent or more, while fabric 7182 has but a 25 per cent overfeed, and the Reisfield article discloses an example calling for only a twelve per cent overfeed, although Reisfield leaves open the possibility of a greater overfeed depending upon the effect desired. Dr. Brown testified that these references tend to teach away from Lesley by suggesting that the maximum effective overfeed was somewhat shy of 40 per cent. Brown, XXVIII: 25; XXX: 246–47, 257.

Lesley also teaches that the back bar yarn should be "capable of substantial elastic elongation." This is clearly disclosed by the prior art references, especially by Cooper.

None of the prior art references explicitly advocate a high degree of stretching of the back bar yarn. Neither do any of the references specifically indicate that the back bar yarn should be knitted under a higher degree of tension than the front bar yarn. The court concludes, however, that the tension differential is inherent whenever there is an overfeed of one warp relative to the other.[26]

Cooper '885 discloses a plated fabric, while Lesley calls for a lap side pile. However, it appears to this court that the "plating" called for by Cooper includes a pile on the lap side, as the accused fabrics demonstrate. Cooper '885 does not, however, explicitly call for a lap side "pile." The court can also accept plaintiff's conclusion, as testified to by Dr. Brown, that Cooper '885 does not inherently call for a pile effect. XXI: 132–33. This is so because Cooper does not specify runner lengths or substantial stretching. (However, even Lesley testified that he knew of no reason not to stretch spandex yarn and have it under tension when knit, XXI: 100, although he had, on occasion, knit it with only a 10 to 20 per cent stretch, "just enough to get it into the fabric." XXI: 101.)

Obviously, there are other differences between the patents in suit and the prior

---

**26.** The relationships among various factors in the knitting cycle, such as stretch and tension, and how they are affected by the use of different let-off and take-up devices, and other mechanical variations in the process, is extremely complex and this court could not hope to articulate them satisfactorily. One thing that is clear, however, is that it is pointless to suggest that any one factor presents the "key" to the production of any one fabric. For example, a high degree of overfeed on the front bar yarn, clearly an important factor in the Lesley patents, can be offset by an impermissibly long fabric quality, which will allow the excess yarn to accumulate on both faces of the fabric. *See* Dr. Brown's discussion of the Burlington fabrics. XXX: 248–53. The fabric quality, further, will vary depending on the amount of yarn supplied to the needles, and by the type of take-up mechanism used to remove the fabric from the knitting elements. Similarly, it is misleading to suggest, as did the Special Master, that the "key" to Cooper '885 lies in denier ratios. Each finished fabric depends for its final appearance and characteristics on a number of factors, not all of them quantifiable. *See Bullard Co. v. General Electric Co.*, 348 F.2d 985, 990 (4th Cir.1965), *citing Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 345, 81 S.Ct. 599, 604, 5 L.Ed.2d 592 (1961) ("there is no legally recognizable or protected 'essential' element, 'gist' or 'heart' of the invention in a combination patent."). *See also Dawson Chemical Co. v. Rohm & Haas Co.*, 448 U.S. 176, 216–20, 100 S.Ct. 2601, 2623–25, 65 L.Ed.2d 696 (1980). *City of Grafton, W. Va. v. Otis Elevator Co.*, 166 F.2d 816, 817 (4th Cir.1948).

art, but the ones noted here are most significant.

## C. *Level of Ordinary Skill in the Art*

As the Special Master stated: "[t]he knowledge and skill of a skilled knitter are of a high caliber. He is able and expected to adapt and supplement general instruction in the construction sheet for a particular fabric in its manufacture." First *Report of Special Master*, finding of fact 63. In addition to this, it appears to this court, from the record as a whole, that knitters generally begin with a rough idea of the end fabric sought, and then, utilizing initial data, trial and error, and common sense, work toward their goal. Further, each knitter has his own vocabulary, and each organization as well as each individual knitter have their own procedure for developing a fabric.

Beyond this, the level of ordinary skill does "not ... easily lend itself to specific articulation. The matter ... seems to be necessarily related to the inquiry of the scope and content of the prior art." *Blohm & Voss AG, supra,* 489 F.2d at 244. The record contains mainly broad generalizations as to the level of ordinary skill, and nothing else need be said about this factor.[27]

## D. *Analysis*

■ Based on the foregoing, the court concludes that the Lesley patents are "obvious," and hence invalid, under § 103. Although the Lesley patents specify a 40 per cent overfeed, while none of the other prior art references do, the principles of *Smith v. Nichols*, 88 U.S. (21 Wall.) 112, 22 L.Ed. 566 (1874), apply:

[A] mere carrying forward or new or more extended application of the original

thought, a change only in form, proportions, or degree, the substitution of equivalents, doing substantially the same thing in the same way by substantially the same means with better results, is not such invention as will sustain a patent.

88 (21 Wall.) U.S. at 119. *Accord, Northern Engineering & Plastics Corp. v. Eddy,* 652 F.2d 333, 339 n. 16 (3d Cir.1981), *cert. denied,* 454 U.S. 1146, 102 S.Ct. 1009, 71 L.Ed.2d 299 (1982); *Scandiamant Aktiebolag v. Commissioner of Patents,* 509 F.2d 463, 466 (D.C. Cir.1974). The 40 per cent cut-off point chosen by Lesley appears to be arbitrary. According to Dr. Brown, Lesley must have "thought that at 40% these fabrics were commercially acceptable fabrics and that at less than 30% they were not." XXIV: 94. But Dr. Brown did not know what, if anything, unusual would occur at the 40 per cent overfeed level.[28] The court cannot agree with Dr. Brown that the Reisfield article and other prior art disclosing a lesser degree of overfeed teach away from Lesley by suggesting that higher degrees of overfeed are not possible. Any good knitter must know that he can knit with all the tension and overfeed that the knitting elements can stand. A more likely explanation for the absence of fabrics with a 40 per cent overfeed is that such fabrics were not commercially salable, as plaintiff's experience with the Lesley-on-sale fabrics demonstrates.

Further, the tight stitches called for by Lesley are obvious in light of Cooper. Although Cooper does not inherently call for a high degree of stretch of the spandex yarn, it is obvious, from reading the patent, that such a degree of stretch is contemplated; otherwise, the desired plating ef-

---

27. It does little good to remark that "the level of ordinary skill in the art is very high." The level of skill of any artisan in his craft is by definition going to be very high.

28. There was some discussion as to whether the pile level would increase along with the overfeed increase at a linear rate. *See* XXIV: 98–108. Dr. Brown thought that the increase would be less than linear at high and low levels

of overfeed, but more linear for moderate degrees of overfeed. XXIV: 99. The exact relationship could be disclosed, however, only through experimentation. XXIV: 108. In any event, the fabric identified as D–39 supports defendant's contention that nothing particularly unusual occurs when the overfeed is 40 per cent. *See* Wyrick, XII: 155–58, for a discussion of this fabric.

fect would not be achieved. Further, the patent specifically allows for experimentation by the knitter to achieve the proper "amount of compression." Col. 3, lines 73–75.

Although plating, and not a pile surface, is called for, the pile is inherent in the plating process. "It is not invention to perceive that the product which others had discovered had qualities they failed to detect." *General Electric Co. v. Jewel Co.*, 326 U.S. 242, 248, 66 S.Ct. 81, 83–84, 90 L.Ed. 43 (1945).[29] It appears that the accused fabrics—admittedly made without knowledge of the Lesley patents and purportedly made pursuant to Cooper '885—both have a lap side pile, and are plated fabrics. It is somewhat inconsistent to suggest that Cooper does not make Lesley obvious because it calls for plating and not a pile surface, while at the same time claiming that the accused fabrics, though plated, infringe the Lesley patents because they also have a lap side pile.[30]

Thus, the court concludes that to a skilled knitter, in 1959, the method and fabrics that culminated in Lesley–2 and 3 would have been obvious in light of the prior art. It is unnecessary to dissect each claim of the patents in suit, for the court does not find them to be significantly different from one another. The anticipation is not complete, but, on balance, the court is confident that defendant has shown that the Lesley patents do not satisfy § 103. In reaching this conclusion, the court has sought to avoid "slipping into use of hind-

sight," a practice condemned by the Supreme Court. *Graham v. John Deere Co.*, 383 U.S. 1, 36, 86 S.Ct. 684, 703, 15 L.Ed.2d 545 (1966), *quoting from Monroe Auto Equipment Co. v. Heckethorn Mfg. & Supply Co.*, 332 F.2d 406, 412 (6th Cir.), *cert. denied*, 379 U.S. 888, 85 S.Ct. 160, 13 L.Ed.2d 93 (1964).

Again, the words of *Smith v. Nichols*, 88 U.S. (21 Wall.) 112, 22 L.Ed. 566 (1874) apply:

> Many textile fabrics, especially those of cotton and wool, are constantly improved. Sometimes the improvement is due to the skill of the workmen, and sometimes to the perfection of the machinery employed. The results are higher finish, greater beauty of surface, and increased commercial value. A patent for the better fabric in such cases would, we apprehend, be unprecedented. The patent in the present case rests upon no other or better foundation.

88 (21 Wall.) U.S. at 119.

## IV. CONCLUSION

The record in this case is voluminous and many arguments have been made by both sides. The court has chosen not to address certain issues in light of its disposition. It has also no doubt missed arguments that either side may consider to be of controlling importance. Such shortcomings are inherent in a case of this magnitude.

In light of the conclusions reached, however, judgment must enter for the defendant.[31] The excellent and complete reports of the Special Master, though reaching a

---

**29.** This rule must be weighed against the countervailing one that purely accidental anticipation cannot be used against a later patent. *See generally The American Original Corporation v. Jenkins Food Corp.*, 696 F.2d 1053, 1058–1060 (4th Cir., 1982). This rule is of less import when, as here, the anticipation is used for obviousness purposes rather than for the purposes of § 102. The pile surface in Cooper, however, rather than being "purely accidental," is a direct result of the plating process, which is the essence of the patent.

**30.** The court does not wish to suggest that the Cooper patent is valid, and expresses no opinion on the matter. The court merely assumes that it is valid, as plaintiff has not challenged it.

**31.** In view of the court's finding that the Lesley patents are invalid, there is no need to consider whether the accused fabrics infringe any or all of the claims of those patents; "an invalid patent can not be infringed." *M. Swift & Sons, Inc. v. W.H. Coe Mfg. Co.*, 102 F.2d 391, 396 (1st Cir.1939). Several comments, however, are in order.

First, the fact that the spandex in the accused fabrics was knitted at approximately the same tension as the nylon makes it highly likely that the fabrics do not infringe at least upon claims 2 and 4 of the '673 patent. These provide that the tension on the back bar yarn should be "substantially above" that of the front bar yarn, which is knitted at a "comparatively light" ten-

different conclusion, are not completely inconsistent with this opinion and, to the extent they are not, this court adopts them. There is no need to adopt or reject the reports on a finding-by-finding or conclusion-by-conclusion basis. This ruling is sufficiently "explicit" to "[avoid] all misunderstanding." *Bullard Co. v. General Electric Co.*, 348 F.2d 985, 990 (4th Cir.1965).

An Order will enter accordingly.

sion. Dr. Brown, in explaining this discrepancy, noted:

> [W]hen we are talking about yarns of this dissimilarity I would read this to mean that a substantially different tension was a tension which would produce a substantially different extension, a substantially different effect, because it is the effect which is important and not the thing which we happen to find convenient to measure by pulling at the yarns with our fingers.

XXX: 154–55. With all due respect to Dr. Brown, this seems to be an attempt of the type noted earlier to have words mean exactly the opposite of what they say. The more plausible explanation for the discrepancy is that knitting with spandex is quite different from knitting with nylon, and Lesley did not envision this difference.

The court is also impressed with defendant's argument that, whereas the '673 patent calls for "permissive retraction after casting off," the accused fabrics were apparently taken off of the knitting elements under tension and the spandex within them was not allowed immediately to contract. Although this seems like a small thing, the patents are so narrow that, if they are construed strictly, every "small thing" seems

rather significant. *See Bullard Co. v. General Electric Co.*, 348 F.2d 985, 988 (4th Cir.1965) ("A conviction of infringement of a combination claim ... can be procured only upon a showing that the suspect embodies every essential constituent ... of the subject of the claim.").

Defendant's other arguments in favor of noninfringement—that the accused fabrics are "balanced" and have lap side piles, whereas the patents in suit call for "unbalanced" fabrics with loop side piles—are foreclosed by the court's conclusions as to the scope of the Lesley patents, *supra* part I.

Finally, the court notes that, although it would have been possible to resolve this matter on the issue of infringement alone, the Supreme Court has admonished the lower courts to "inquire fully into the validity of [the] patent ...," for, as between the questions of validity and infringement, the former "has the greater public importance...." *Sinclair Co. v. Interchemical Corp.*, 325 U.S. 327, 330, 65 S.Ct. 1143, 1145, 89 L.Ed. 1644 (1945). *See also The Duplan Corp. v. Deering Milliken Corp.*, 444 F.Supp. 648, 725 n. 60 (D.S.C.1977), *modified*, 594 F.2d 979 (4th Cir.1979), *cert. denied*, 444 U.S. 1015, 100 S.Ct. 666, 62 L.Ed.2d 645 (1980).